H31TORUC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MORENA ORUE, et al.,

                 Plaintiffs,

          v.                          15 CV 5727 (KFP)

ARTISANAL FROMAGERIE & BISTRO,
LLC, et al.,

                 Defendants.

------------------------------x
                                      New York, N.Y.
                                      March 1, 2017
                                      11:00 a.m.

Before:

                    HON. KATHERINE P. FAILLA,

                                          District Judge

                         APPEARANCES

FITAPELLI & SCHAFFER
     Attorneys for Plaintiffs
BY:  BRIAN SCHAFFER

SALVATORE LIGA
     Attorney for Defendants

ALSO PRESENT:  VINCENT BONFITTODRORY, Defendant

1          (In open court, case called)

2          THE COURT:  Good morning to both of you.  Welcome.

3          Mr. Liga, there's a history here.  You're joining this

4     case, and that is fine.  I would like to have an understanding

5     as to what is going on.  My recollection of events is that over

6     the summer there was a settlement agreement, it was signed,

7     payments were not made by any of the settling parties.  There

8     was, for the Artisanal corporate entity, a bankruptcy that I

9     understand is nearing resolution, if not resolved.  I have had

10    comparable discussions with Mr. Brennan about his payment

11    schedule.  Those things are squared away.  And I would like to

12    understand what is going on with respect to Mr. Drory.

13         So tell me, please, what is going on with respect to

14    Mr. Drory?

15         MR. LIGA:  Your Honor, as you know I just came into

16    the case.

17         THE COURT:  I will ask you please to first grab the

18    microphone, and if you could stand, because there is a monitor

19    that is blocking you.

20         MR. LIGA:  No problem.

21         THE COURT:  Thank you very much.

22         MR. LIGA:  I spoke with Mr. Drory about this matter,

23    very frankly and bluntly.  As I indicated to your Honor when I

24    requested the adjournment, I'm not one to make arguments for

25    sake of arguments.  I went through the whole history with him.

1          THE COURT:  All right.

2          MR. LIGA:  Mr. Drory, regardless of how I feel about

3   it or people in business feel about it, he feels he's been

4   improperly prosecuted for this type of matter.

5          THE COURT:  Let's stop for a moment.  There's no

6   prosecution involved yet.

7          MR. LIGA:  I'm talking in the course of litigation.

8          THE COURT:  I see.  He feels he was not well

9   represented?

10          MR. LIGA:  He doesn't feel he was properly

11  represented.  He feels that the plaintiff's attorney -- he

12  stated to me -- solicited his employees, and he felt that was

13  improper, and that the whole matter at the time he was

14  represented was hinged -- he has an insurance policy,

15  apparently, that is supposed to cover these types of matters.

16          THE COURT:  I looked into that, sir.  I have strong

17  reasons to believe that an insurance policy would not cover

18  these matters.

19          MR. LIGA:  Okay.  He's represented to me that there is

20  an insurance policy for this type the of matter.

21          THE COURT:  I'm sure.  And I would be interested in

22  looking at that these endorsements because I have some

23  familiarity with this particular type of coverage, and I'm

24  pretty sure it's not covered, but we'll deal with that, yes.

25          MR. LIGA:  So the idea behind a settlement, the way I

1  understood it was laid out, it was really based on the maximum

2  that they believed the insurance covered, which was about

3  $150,000, and that was why it was settled the way it was

4  settled, according to Mr. Drory.

5          Since that time, his business, his primary business,

6  the restaurant in question, has closed, it's out of business,

7  it went into bankruptcy.  It lost its lease.

8          THE COURT:  But it was moving locations.

9          MR. LIGA:  My understanding is this new location is

10  not the same entity, as far as I understand it to be.

11          THE COURT:  I understand it to be Mr. Drory is behind

12  this entity.  Is he not?

13          MR. LIGA:  He will be an operator of it but not an

14  owner because he simply doesn't have the finances to.  He's

15  like, I would call him -- it's his vision, but he doesn't have

16  the money to finance this new operation.  And frankly, at this

17  point I'm not sure he will have the financing to complete -- to

18  actually build the restaurant itself.

19          I got involved with Mr. Drory back in September due to

20  his financial problems.  I came in to help him negotiate some

21  settlements with some parties at that time.  So I'm a little

22  bit of familiar with the financial problems the business had,

23  the losing of the lease, and his attempts to try to raise the

24  capital through partnerships or any kind of offering he could

25  put together to try to finance this other restaurant but he

1     didn't have the money.

2          Since then it's been represented to me he has got hit

3     with an IRS lien personally that's in the six figures.  He

4     could explain it in more detail if you would like.  His

5     personal bank account has been seized, so he doesn't have any

6     personal funds whatsoever.

7          My understanding is his only means of support right

8     now, and why I had gotten the case originally, Mr. Drory's

9     girlfriend is a corporate lawyer for a very wealthy individual,

10    and she basically supports his personal household.  He lives

11    with her.  But apart from that, he has no assets that are

12    attachable.  He hasn't decided to go personally bankrupt.

13         My understanding is because when he's trying to go out

14    and hopefully set up a restaurant, investors don't want to

15    hear, obviously, you just filed personal bankruptcy.  So that's

16    his situation.

17         My understanding is he has no means whatsoever to pay

18    this settlement apart from his belief that there was an

19    insurance policy, and that's where he is at this point.  He

20    could explain himself, but going through this whole thing with

21    him, I made it very clear to him --

22         THE COURT:  Sir, let me stop you.  I don't want to

23    know about your privileged communications.

24         MR. LIGA:  No, but I want to explain this to the Court

25    because I think it's relevant to this.

1     As a lay person, he's like many lay people, he feels

2   he was improperly represented.  He feels like this lawsuit

3   wasn't fair.  I said well that's all well and good, I

4   understand that, lots of people in the restaurant industry get

5   hit with these types of lawsuits.  I said at the end of the day

6   there was a lawsuit, at the end of the day it was settled, at

7   the end of the day your signature went on that settlement.  So

8   if you have a claim against your lawyer, make claim against

9   your lawyer.  If you have a claim -- if you believe there's a

10  claim against your insurance company, make a claim against your

11  insurance company, but none of that is really relevant in this

12  matter in paying the judgment.

13     I'm telling your Honor, as I explained to him, if

14  there's no money, there's no money.  If he doesn't have the

15  money, he doesn't have the money.  I'm more than happy to

16  coordinate a type of due diligence with the plaintiff's lawyer

17  into his finances if that will satisfy him or satisfy the

18  Court.  But as far as I understand it, he has no financial

19  means.

20     THE COURT:  I want to understand certain things that

21  you have just said, and there may be a degree of me kicking

22  your tires of what you're saying because I need to understand

23  this.  At this time -- because you represent Mr. Drory, at this

24  time, you are not moving to find that the settlement agreement

25  wasn't reached.  You're not contesting that there was a

1    settlement agreement that was reached, is that correct?

2              MR. LIGA:  At this moment, no.

3              THE COURT:  Well, this would be the moment to do it.

4    I'm not saying it would win because the Winston factors which

5    govern whether settlements are enforceable would suggest this

6    is an enforceable settlement.  I take your point, which is if

7    he feels he's been wronged maybe the place to which he should

8    look is the prior law firm.  I'm not saying they did anything

9    wrong, I'm just saying don't think there's anything here.

10             On the insurance coverage issue, again, it would be a

11   surprise for me to learn that a policy for a restaurant would

12   include wage and hour claims because more often than not they

13   are specifically excluded, but we'll see.  Stranger things have

14   happened.  You could get coverage for a lot of things.

15             But I will tell you nothing in any of the discussions

16   that I heard from the parties and the time over which I have

17   been presiding over this case even mentioned the insurance

18   policy.  I never heard about it until we got into thicket that

19   we're now in.  So it would be a surprise for me to hear that

20   everything was contingent on an insurance policy I never heard

21   of because usually when that is the issue, for instance, the

22   claim gets tendered to the carrier, the carrier appoints the

23   counsel, the carrier is deeply involved in the settlement

24   discussions to ensure what it will pay and wouldn't pay.  I saw

25   none of that.

1          MR. LIGA:  I have gone through that line of

2     questioning --

3          THE COURT:  I see, sir.

4          MR. LIGA:  -- with my client and his girlfriend, who

5     is a corporate lawyer and who would understand these questions

6     better than Mr. Drory.  It's been explained to me that, again,

7     there is coverage.  The insurance company was upset -- which I

8     would understand -- their counsel was not engaged in the

9     settlement.

10          THE COURT:  So wouldn't they have disclaimed coverage

11     on that basis?

12          MR. LIGA:  That was my question, and it was told to

13     me -- and again, I did not go off in all these tangents in

14     every case, but I was told there's a pending order to show

15     cause against the insurance company.  If that's true or not, I

16     don't know, but it's been expressed to me that's what is going

17     on.

18          THE COURT:  Where is that case taking place?  Is it in

19     state court?

20          MR. BONFITTODRORY:  I'm allowed to say?

21          THE COURT:  I would prefer that I hear from you and

22     not from him because I don't do the hybrid representation, so I

23     will let you talk to him and then communicate with me.

24          MR. BONFITTODRORY:  Am I allowed to speak in court?

25          THE COURT:  No, sir, that's why you have counsel to

1    speak for you.

2         MR. BONFITTODRORY:  But for me it's very important

3    that you hear what I have to say.

4         THE COURT:  Sir, I will not listen to you, I will

5    listen to your attorney.  That's why you have counsel.

6         (Pause)

7         MR. LIGA:  With regard to the order to show cause --

8         THE COURT:  Yes, sir.

9         MR. LIGA:  -- according to my client, it's been

10   prepared, it hasn't been filed.

11        THE COURT:  That does me no good.

12        MR. LIGA:  It doesn't exist.

13        THE COURT:  Yeah.

14        MR. LIGA:  The issue with the insurance company,

15   again, according to by client, wasn't that it was just -- that

16   they brought their counsel in, apparently, the bigger issue is

17   it didn't cover all the employees it only covered eleven.  They

18   wanted a more universal settlement across the board for all the

19   employees in case I guess there might by another lawsuit later

20   from other employees.

21        THE COURT:  Sure.  The issue, of course, is that FLSA

22   claims are opt in, not opt out.  So for a case of this type --

23   and Mr. Schaffer will correct me if I'm wrong -- it's just the

24   folks I have before me.  We don't get to -- by law, we can't do

25   bigger.

1              MR. LIGA:  I understand entirely.  That's that issue.

2         The other issue he wanted to stress to me and stress

3    to the Court was this new location has nothing to do with the

4    old location, and the new location has an entirely different

5    ownership structure which he's not a part of.  It's his vision,

6    he's trying to create this Parisian experience and he's the

7    person behind the vision, but he's not the owner of it.

8         And it's been structured, according to him, for

9    several years now that this has been in the planning, and he is

10   not the primary or any owner of this entity, he's just -- it's

11   been a proposal of his basically from patrons who liked his

12   restaurant that closed, they said why don't you open something

13   larger and more elaborate with a cabaret and smoking bars and

14   all these things that the idea for the new place was this would

15   be a much broader experience, and it has an entirely different

16   ownership structure.  Again, it's his vision because it started

17   out with his restaurant that closed, but he's not the owner of

18   it.

19             THE COURT:  Sir, let me explain the various concerns

20   that I have.  I understand that that restaurant has not opened

21   yet because when I pass by it it has the signs in the windows

22   and not yet opened.  But among my many concerns here are the

23   fact that in the summer of this past year, 2016, when these

24   negotiations were under way, no one ever suggested that

25   Mr. Drory or the Artisanal company could not handle this

H31TORUC

1    judgment.

2         I was then asked to delay entry of the settlement

3    agreement so that Mr. Drory could sign.  And then very shortly

4    thereafter the company goes in the tank and he suddenly

5    announces he's not going to pay.  So it may be, and I don't

6    know, that he is in as dire a financial condition as you

7    outlined for me this morning --

8         MR. LIGA:  I could explain that a little bit.

9         THE COURT:  Let me finish my sentence, thank you.

10         -- but you haven't convinced me that back in July and

11    August he was this bad.  And it's not fair to the plaintiffs in

12    this case that he managed to fritter away or move or dissipate

13    all of those as assets and leave them with nothing.  That's the

14    problem I have, because I don't have any confidence that he was

15    in this bad a shape in July and August.  And I therefore am

16    left to wonder whether all of the past six months of effort

17    were designed to put us in a position where we are right now

18    where he could have someone stand in his stead and say there

19    are no assets.

20         MR. LIGA:  I can only speak for myself and my own --

21         THE COURT:  Your client wishes to speak to you.

22         (Pause)

23         MR. LIGA:  Mr. Drory -- the history of this

24    restaurant, again, and I could talk from my own firsthand

25    knowledge, so I will represent that this is my firsthand

1    knowledge of these events to the extent I can explain to Court

2    what I know.

3           Mr. Drory was being pursued by various creditors last

4    summer, primarily in the food industry, within the food

5    industry, and also through what's called merchant advance

6    companies.  I am actually a collection attorney and a

7    specialist in the food industry and I do bankruptcy work within

8    the food industry, so I was actually, by one of his creditors,

9    told:  Why don't you go see this man, he needs a lot of help.

10   He has these lawsuits, he owes people money, why don't you get

11   involved with him.  That's how I personally was introduced to

12   him.  And I worked with him dealing with one in particular

13   creditor.  I can tell you at that time he was -- and this is,

14   again, August, September of last year -- he was not on any good

15   solid financial ground by any means that I can see.

16          It's also my understanding from that that he had

17   purchased -- this was a failing restaurant at one point and he

18   took it over.  I don't know if he was properly represented

19   again by counsel because I would never advise a client to buy a

20   business like this, but it had all kinds of outstanding

21   liabilities, payroll taxes, sales taxes, there was -- it was a

22   nightmare.

23          Nightmares are good in business for two reasons; one,

24   you can usually buy nightmares cheap, and if you're a good

25   turnaround person you can build something out of a nightmare

1  without having a lot of capital initially.  I think that's what

2  he did.  He brought in his ideas and built the business from

3  what was a failing restaurant.

4       The other thing I can tell your Honor, at the time he

5  believed, as he represented to me, that he was going to stay in

6  that existing location at least for another six months before

7  it closes.  And the reason -- his lease was coming up, but

8  coming into the holiday season, which is the biggest season in

9  the food industry, why would your landlord, who you may owe

10  money to, which he did, not allow you to go through the holiday

11  season when you're best able to pay him.

12       And he believed in good faith, I believe, that his

13  landlord would allow him to at least go through Thanksgiving,

14  Christmas and New Year's, get all those parties and those

15  special events that you normally get in the food business, and

16  then he can pay the landlord and get a small extension of time.

17  As it turns out, his landlord is I believe Chase Bank who

18  doesn't care about losing that season, and they -- I guess

19  because he had fallen behind on his rent, they were going to

20  evict him.  That is what I understand, because I have spoken to

21  at one point with Mitch Green, which is the attorney for the

22  bankruptcy.  That was the catalyst for filing bankruptcy

23  initially.  Then there was a settlement made with the landlord

24  early on, and he vacated I believe on Halloween, the end of

25  October.

1          I can tell you from talking to him months prior, he

2     did not believe that was going to happen.  That said, I can't

3     represent to the Court and I don't feel comfortable with my

4     client representing to the Court, or if he did, I don't believe

5     he made any kind of financial disclosure to anybody when he

6     entered into these settlements.  If he did, I would be

7     surprised.  If he did, I don't know how anyone would give him a

8     settlement of this nature.  Because I think that a lot of his

9     liabilities were well known if somebody did due diligence,

10     including taxes and so forth.

11          If there had been adequate financial due diligence at

12     the time of the settlement -- I don't think he did anything to

13     to conceal his financial wherewithal, I think he, like a lot of

14     entrepreneurs, was very optimistic that he would be able to get

15     through the holidays and pay some of these bills, and I believe

16     that he believed that he had insurance coverage.

17          Now my understanding, this insurance coverage isn't

18     part of a regular restaurant package, this was a special

19     product specifically designed for this.  That's what he is

20     explaining to me.  And I have heard restaurants -- because I'm

21     in this field of business, it's the focus of my practice, there

22     are certain types of policies like this.

23          THE COURT:  Yes.

24          MR. LIGA:  So whether in this particular instance

25     that's this kind of policy, I don't know, but it's represented

1    to me to be the case.  And I take the representation from his

2    girlfriend, who is a corporate lawyer, who I know she knows her

3    stuff and I'm friends with her, I don't see any reason she

4    would mislead me in that understanding.

5         So again, I don't know why the insurance company

6    hasn't paid.  I don't know what their real reason for not

7    paying.  I don't know if he filed his claim properly.  I don't

8    know if he's precluded coverage because he didn't have their

9    lawyers.  I asked all these questions in good faith because,

10   again, I wanted to come here and tell the Court everything I

11   possibly could.

12        And the fact is right now, again, he has no money.  As

13   far as I understand, if this insurance company doesn't pay, I

14   don't know if there's any way for him to get paid, and I don't

15   know of any assets that have survived or will survive that

16   bankruptcy.  Because as the Court probably knows, when a

17   restaurant closes, those assets -- there's nothing really left.

18   Everything gets valued as very little to nothing.

19        I had already explored with him at one time sometimes

20   these restaurants when they have nothing, they have a half a

21   million dollars in liquor and things like that that they can

22   sell.  Again, I don't know how that was dissipated, but that's

23   highly regulated.

24        But I had all those kinds of discussions, I could tell

25   your Honor in my interactions with him.  And I know that he is

H31TORUC

1    out trying to raise capital and his girlfriend is trying to

2    raise capital to try to further develop that restaurant that

3    you have seen that he's not an owner of.  That's all I have to

4    say.

5              THE COURT:  I have some questions though.

6              I knew from early September that there were problems

7    with this settlement.  So I don't know when the first hiccups

8    were with the landlord again, but I'm telling you the first I

9    heard about it was in September, and at that point he wasn't

10   making payments.  And this been a very long saga of having the

11   conversation that we're now having.

12             Second, on your point about due diligence, we were

13   commended to a website that he had suggesting all manner of

14   business successes, so I'm not sure what due diligence -- I'm

15   not sure that Mr. Schaffer should not have accepted at face

16   value the representations of Mr. Drory's counsel that this

17   settlement could be paid.

18             To the extent we're suggesting any sort of victim

19   blaming or Court blaming, we had no reason to think that there

20   was anything other than an ability to pay.  And yet again I

21   will let Mr. Schaffer speak to this issue eventually this

22   morning, but I never understood that the settlement agreement

23   was tied directly to the receipt or distribution of any

24   insurance proceeds.

25             MR. BONFITTODRORY:  A hundred percent.

1           THE COURT:  Sir, do not speak.  Thank you.

2           The issue we have now, Mr. Liga, is we're here on an

3      order to show cause.  It would be lovely if you told me that

4      you and Mr. Schaffer had been in consultation and that you

5      tried to work something out with plaintiff's counsel but I

6      don't know that you have.

7           They have had a settlement agreement since July of

8      2016.  It is appropriate for them to recover something on it.

9      Understanding that there may be financial issues and hiccups

10     that arise, nonetheless your client did put us through the

11     wringer by not appearing for multiple conferences or telephone

12     calls, not being able to address things in a more timely

13     fashion that has resulted in costs to plaintiff's counsel that

14     I think are fairly assessed against your client.  And you're

15     shaking your head yes, so you don't disagree with me.

16          MR. LIGA:  I understand.

17          THE COURT:  What do you propose?  Mr. Schaffer and his

18     clients, I don't imagine they will walk away.

19          MR. LIGA:  I'm not telling them to walk away.  What I

20     am saying to your Honor -- and again, I'm at a little bit of

21     disadvantage, in a sense.  From the world I come out of,

22     numbers are numbers are numbers are numbers.  In bankruptcy

23     court if the numbers don't work, they don't work.  In

24     collection matters the same thing; if the numbers don't work,

25     they don't work.  There's a difference between someone who

H31TORUC

1    won't pay and someone who can't pay.

2              I understand the Court entirely when you say there was

3    this presentation or outward appearance of an ability to pay.

4    I understand that.  I'm not trying to make excuses, I'm trying

5    to explain to the Court my understanding of it.  That's the

6    showmanship end of my client.

7              THE COURT:  Sure, but Mr. Schaffer settled based on

8    that showmanship.

9              MR. LIGA:  However --

10             THE COURT:  Yes.

11             MR. LIGA:  -- in my world I would never settle with

12   anybody for any amount of money until I did some type of

13   meaningful due diligence.  When someone says I'm the greatest

14   restaurant in New York and I'm planning to do this and I'm

15   hoping to do that and look at my wonderful restaurant, I could

16   told you that most restaurants in New York City are insolvent.

17             So what I'm telling the Court, I'm not trying to --

18   I'm not -- I'm making an excuse, but I'm expressing to the

19   Court that there's a difference of showmanship and someone who

20   is entrepreneur and sitting down like a bank would and diving

21   into due diligence to decide if I'm going to lend someone

22   money.  This settlement, in effect, is a loan.

23             THE COURT:  No, it isn't, it's a repayment of wages

24   that were not paid.  It is not.  And the point is --

25             MR. BONFITTODRORY:  May I speak for a moment?

H31TORUC

1    THE COURT:  No, let us finish our conversation first

2    and then you can speak with your lawyer.

3    The issue is -- again, I will hear from Mr. Schaffer

4    in a moment, but at no point did Mr. Drory's counsel suggest to

5    me that this had to be done in a certain manner or in a certain

6    time frame lest it be unable to be done.  And so again, you

7    are -- certainly Mr. Schaffer wishes, perhaps, that he knew

8    then what he knows now, and maybe he doesn't, but I'm not

9    faulting plaintiff's counsel at all in this.

10    MR. LIGA:  I'm not trying to fault anybody, I'm trying

11    to explain what I believe to be the case.

12    THE COURT:  But here we are.  So what do you propose,

13    sir?

14    MR. LIGA:  My proposal is the only proposal I could

15    make, frankly, is that I can sit down with Mr. Schaffer similar

16    to what we do in called a 341 hearing, which is like a hearing

17    going through all the assets.

18    THE COURT:  At least some of us in the room knows what

19    that is.

20    MR. LIGA:  We could go through a 341 type hearing.  He

21    could ask questions like a trustee would or a creditor would.

22    We could go through and produce documents like a trustee would

23    expect in a 341 hearing, or if you want to take it to the next

24    step, like a 2004 hearing, which is far more thorough, and he

25    can see what my client can or cannot afford and what is real.

H31TORUC

1    Again, I don't know a solution when someone doesn't

2    have money to enforce a judgment against him; put a judgment

3    out there and hope over the next 10 to 20 years you can collect

4    it.  That's all you can do.  But to get some type of -- in

5    bankruptcy court this would be considered a priority claim, but

6    even priority claims sometimes can't go unpaid if there's no

7    assets.  It's just the way it is.  They could certainly get a

8    judgment and that judgment can follow somebody for many years.

9    But at this point I don't know what else to suggest to the

10   Court.  Again, from my world, it is what it is.  When there's

11   no money, there's no money.

12   If my client -- again, similar to bankruptcy, if there

13   was a fraudulent transfer, if there's any kind of belief that

14   my client converted assets or didn't give assets properly to

15   creditors, he's more than willing to go through that

16   examination with me.  I'm sure the bankruptcy court is going

17   through that examination with the restaurant because that's

18   where all the is assets were.

19   THE COURT:  I had been advised to the contrary.  I was

20   advised that the bankruptcy was likely to be dismissed or

21   resolved because there were no assets in the Artisanal entity,

22   so candidly it wasn't worth the time to figure out.  So we

23   won't have that clarity because they didn't bother to do it.

24   Mr. Schaffer.

25   MR. SCHAFFER:  It's relevant to what you're talking

1    about right now.

2         THE COURT:  Yes, sir.

3         MR. SCHAFFER:  In our additional due diligence, we

4    discovered that -- so the creditor made a motion to dismiss,

5    and I think we discussed that at some point saying there were

6    no assets.  However, and counsel should know this, and

7    certainly his client knows this, that on February 17, 2017 the

8    landlord filed a motion to oppose the motion to dismiss stating

9    that there was the possible fraudulent conveyance from

10   Mr. Drory to his live-in girlfriend, Ms. Shulman, to settle her

11   2.5 million unsecured claim.

12        So the bankruptcy appears to be far from over, and

13   there's a conference scheduled for March 7 on that issue.

14        THE COURT:  She herself had a claim -- she had a claim

15   against Mr. Drory?

16        MR. SCHAFFER:  Yes.

17        THE COURT:  And he paid perhaps in derogation of the

18   rights of other creditors.

19        MR. SCHAFFER:  Yes.

20        THE COURT:  We'll find out.  I will let you finish,

21   Mr. Liga, because I do want to hear from you.

22        MR. LIGA:  I'm not here to make -- that's not my

23   judgment call if that's in fact the case and the Court wants to

24   get to the bottom of it, if Mr. Schaffer wants to examine my

25   client, as a lawyer, I'm not emotionally attached to it.  I

1    will represent my client, I will certainly deal with the

2    document request and due diligence request and sit through

3    depositions if he would like.  All I'm telling the Court, as

4    far as I understand it, me, there's nothing there, but I

5    certainly am willing to go through the exercise.  I have no

6    problem with that.

7          THE COURT:  Your client wishes to speak to you, and I

8    will let you do that.

9          And Mr. Schaffer, I would really like to hear from

10   you, so let me let them speak unless there's any addenda to

11   this conversation.

12         (Pause)

13         THE COURT:  Mr. Liga.

14         MR. LIGA:  Sorry, your Honor.

15         THE COURT:  That's fine.

16         MR. LIGA:  With regard to an examination, again I'm

17   going to -- I welcome that as a solution to try to satisfy the

18   Court, satisfy the plaintiff's counsel.  Mr. Drory wanted me to

19   express to the Court that one of the issues, again, he is

20   telling me, the issues with the insurance company, he had a

21   problem.  Apparently the prior owner, there was an issue for

22   four and a half years with these violations on pay, and

23   Mr. Drory was only six months.

24         THE COURT:  I believe what he's telling you is he

25   believes Mr. Brennan should have borne a larger percentage of

1    settlement, but that's the settlement he agreed to, that's not

2    my concern.

3              MR. BONFITTODRORY:  I didn't agree to nothing.

4              THE COURT:  I'm not listening to you, sir.

5              MR. LIGA:  He believes his lawyer did not properly

6    represent him, and his insurance company is upset they got

7    burdened with something disproportional to their share.

8              THE COURT:  But that deed is done.

9              MR. LIGA:  I understand.

10             MR. BONFITTODRORY:  Your Honor --

11             THE COURT:  Sir, I'm not going to listen to you.  You

12   have an attorney.  That's why he's here.

13             MR. BONFITTODRORY:  This is supposed to be justice.

14             THE COURT:  This is justice.  You have been dogging

15   your obligation for a period of months --

16             MR. BONFITTODRORY:  I will agree with --

17             THE COURT:  Sir, I'm not going to engage you on this.

18   You have an attorney.

19             MR. BONFITTODRORY:  If you don't want me to defend

20   myself and explain.

21             THE COURT:  I want you to speak through your counsel.

22             MR. BONFITTODRORY:  You don't want to know the truth,

23   honestly.

24             THE COURT:  You have an attorney, he's communicating

25   your information to me.  If there's something you haven't

H31TORUC

1   communicated to him to give to me then you're welcome to do it,

2   but I'm not going to engage you on this.

3       Mr. Schaffer, let me hear from you now at this time,

4   sir.

5       MR. SCHAFFER:  Just a few things so the record is

6   completely accurate.  As your Honor stated, actually not until

7   today was any issue of inability to pay raised; never in my

8   settlement discussions, never in the course of trying to get

9   Mr. Drory to appear today.  In fact, when Mr. Drory did appear,

10  I believe it was about two months ago, the issues that he

11  raised were issues regarding Terrence Brennan and the

12  proportionality and some alleged improper conduct by me.  Even

13  when he showed up here two months ago he didn't even raise an

14  inability to pay.  He never raised it.

15      THE COURT:  No, he raised to me the possibility of a

16  motion to undo the settlement because of bad advice received

17  from his counsel.

18      MR. SCHAFFER:  Right.  Never an inability to pay until

19  present day March 1st, 2017.

20      THE COURT:  But what if it's true, what if there is no

21  ability to pay?

22      MR. SCHAFFER:  I believe it's patently untrue.

23      THE COURT:  And Mr. Liga has been mouthing or

24  repeating to me false information from his client?

25      MR. SCHAFFER:  I believe, yes.  Yes.  And I will tell

1    you a few reasons why I believe that.

2          THE COURT:  Okay.

3          MR. SCHAFFER:  Firstly, if a restaurant is failing,

4    which I understand there are restaurants that fail, sure.  If a

5    restaurant fails, you don't close that restaurant and open up

6    the same restaurant three blocks away three times the square

7    footage.  That doesn't happen.  Restaurant fails, it goes away,

8    goodbye.

9          THE COURT:  But what he's suggesting was maybe it

10   wasn't failing as much as the model where he was owner and

11   operator wasn't working and the landlord wasn't allowing him to

12   stay because of background, and so therefore, the way around

13   that was something where he was no longer the owner and he was

14   just the operator.  I take your point, I'm just saying there is

15   another way of looking at it.

16         But go ahead, give me another reason why you believe

17   this is not correct.

18         MR. SCHAFFER:  Okay.  A few things that counsel said

19   in terms of the liabilities and creditors, those are all on the

20   corporation, those are on the Artisanal LLC.

21         THE COURT:  The tax lien is on him personally.

22         MR. SCHAFFER:  That's something that was just

23   communicated today.  But aside from that, which I don't know if

24   it's true or not, anything that has been discussed so far in

25   the Artisanal bankruptcy has been the assets of Artisanal LLC.

1        Mr. Drory, as far as I understand it, is not going to

2   be on the hook personally for any of that because there's no

3   personal liability to an LLC in a restaurant, so that just

4   doesn't make sense to me as far as I understand it.  So in

5   terms of anyone looking into Mr. Drory's finances, the

6   bankruptcy court and the trustee would have no reason to look

7   at Mr. Drory's personal assets.

8        MR. BONFITTODRORY:  Can I --

9        THE COURT:  You can speak to him as soon as

10  Mr. Schaffer is done.

11        MR. BONFITTODRORY:  Thank you.

12        MR. SCHAFFER:  Additionally, Mr. Drory submitted a

13  sworn affidavit under the penalty of perjury with the

14  bankruptcy court in September which stated the estimated the

15  operating expenses of the debtor for the next 30 days, total

16  income of one million dollars, total net income $575,167.  And

17  in the motion to oppose the dismissal, the landlord cited that

18  as well.

19        THE COURT:  May I understand the significance of what

20  you just read to me again?  Tell me please what you believe

21  this is.

22        MR. SCHAFFER:  As far as the landlord's motion to

23  dismiss the effort to dismiss the bankruptcy, the landlord's

24  arguing Drory and the restaurant had money because they

25  represented in a sworn affidavit that the net operating profit

1   was $575,000 for the next 30 days.

2           THE COURT:  Then why -- not for nothing, but then why

3   go into bankruptcy?  Because there was such an accrued debt

4   that that little bit wouldn't have mattered?

5           MR. SCHAFFER:  I think the landlord may have commenced

6   an action for eviction in Supreme Court in New York.  I think

7   there's a parallel action also, and it had to do with

8   non-payment of rent.

9           THE COURT:  Okay.

10          MR. SCHAFFER:  Another thing that Mr. Drory swore in

11  his affidavit was that he was paid a salary from Artisanal, the

12  LLC, of $170,000.

13          THE COURT:  Per year, per month?

14          MR. SCHAFFER:  Per year.  But that's a fairly

15  significant amount of money, where is that money?

16          Additionally, all counsel is saying is that Drory will

17  be an operator, not an owner.  If he's not an owner and only an

18  operator, why is he allegedly the one challenged with coming up

19  with the financing of the operation?  That would be something

20  that the owners do.  If he's just a consultant, presumably he

21  will be paid a salary or management fee or some other fee like

22  that and he wouldn't be the one in charge of raising the funds.

23          In terms of raising the funds, your Honor, a lease was

24  signed, I believe it's on Park Avenue.

25          THE COURT:  Park Avenue South.

H31TORUC

1    MR. SCHAFFER:  Park Avenue South for a huge space.  As

2    someone who has entered into a lease on behalf of a business,

3    my law firm, I know what a landlord requires.  I have 8,000

4    square feet, I don't have 30 or 40,000 square feet that the

5    restaurant has.  So the landlord would have required financial

6    disclosures back three years, personal financial statements, I

7    mean a million things.

8    THE COURT:  But would those not, sir, or could those

9    not have been provided by the individuals who will be owners of

10   this new space because it's been represented to us he is not.

11   MR. SCHAFFER:  Could have been.  Again, we have seen

12   nothing, and nothing prior to today suggesting in any way that

13   Drory would not be the owner of the new Artisanal and only be

14   an operator.  As your Honor indicated, the websites and the

15   literature out there, Mr. Drory holds himself out to be the

16   guy, the owner.  I would honestly be surprised--

17   MR. BONFITTODRORY:  You're lying.

18   MR. SCHAFFER:  -- if Mr. Drory is not involved in

19   signing the lease or the new corporate entity.

20   THE COURT:  Mr. Drory, I will not have another

21   outburst.

22   Mr. Liga, please understand I have this thing called

23   contempt powers.  You know what they are, you know I can use

24   them.  If your client does not stop interrupting other people,

25   I will call the marshals in here.

1          MR. LIGA:  I understand.

2          THE COURT:  Then you will let him know that as well.

3          Please continue, Mr. Schaffer.

4          MR. SCHAFFER:  So I find it hard to to believe

5    Mr. Drory's name was not on the documents submitted by whomever

6    to secure the new lease, considering how significant it was,

7    I'm sure it was a 10- or 20-year term.

8          I want to see what documents were signed, who signed

9    them.  I want to see who are the members of the new LLC.  What

10   counsel is representing is based on corporate law.  The first

11   Artisanal declared bankruptcy.  That entity is in the garbage.

12   They formed a new entity, a new LLC.  The reason why people do

13   that is to avoid liability.  But we have the personal liability

14   of an individual whose finances have never been explored, and

15   as your Honor correctly stated, was never represented to me in

16   any way that there was any inability to pay.  In fact, the

17   opposite was conveyed to me, which is why there was no pay out

18   structure for the settlement.

19         I settle lots of FLSA cases, and I'm sure you seen,

20   your Honor, where the defendant says I can't pay, and there's a

21   pay out of a few months to a year, there's a confession of

22   judgment, and plaintiff's counsel sees financials in order to

23   evaluate whether the payment plan is needed or will be

24   successful.  None of that happened here.

25         One of my last points is we heard about this insurance

1  policy over and over.  Where is this insurance policy?  I mean

2  this is not hard to see.  Where is it?  As your Honor stated, I

3  don't believe that an insurance policy would ever cover wage

4  and hour liabilities, what I have seen is that it could cover

5  attorney's fees.  I never seen it cover the actual loss of wage

6  and hour.

7        THE COURT:  Sir, at any point in your discussions with

8  prior counsel was there even mention of the insurance policy?

9        MR. SCHAFFER:  Not one time.  Not one time.

10        THE COURT:  Now here's the thing, Mr. Schaffer,

11  everything you have said to me -- almost everything you said to

12  me is supposition.  You are intuiting from public statements,

13  you're intuiting from court documents, but you don't know.  And

14  if I look at the other side of the issue, I have Mr. Liga, who

15  is standing up as an officer of this Court and representing to

16  me that his client is in a bad way financially.

17        Other than time and resources, which I'm not going to

18  say are insignificant in this case, what is lost by meeting

19  with him and talking and getting every bit of detail about the

20  issues that you have just raised with me?  Because it would

21  seem to me if those discussions disclose that actually

22  Mr. Drory is in better shape, that's good for you on one front

23  and it's bad for him on another.  And if it shows that he

24  really is as bad as it has been and represented to me today,

25  there could be discussions about what to do going forward.

1          So my point is you have spent many, many hours since

2     July dealing with this issue, as have I.  I entered a

3     settlement agreement, I thought this case was done, but I spent

4     more time after the settlement agreement than I spent on the

5     entirety of the case and on many cases that I have had.  And

6     that's fine, because we need to get clarity on this issue.  Why

7     not take him up on his offer, sir?

8          MR. SCHAFFER:  I mean I could.  I could.

9          THE COURT:  Tell me why.  You could say to me you

10     don't think it would be fruitful, you could say to me you're

11     not going to believe him, but why not discuss it at least in

12     the first instance with Mr. Liga?

13          MR. SCHAFFER:  I believe, other than my time, there is

14     no down side.  I guess the only caveat that I would like to lay

15     on the table is that counsel with his client have to be fully

16     transparent, and anything I ask for they -- I can't be on a dog

17     and pony show, they need to show me what I need to see.

18          And one question I have that should be able to be

19     answered right now is this whole discussion about Mr. Drory

20     being the operator and not the owner, I want to know what

21     Mr. Drory had been paid so far in regards to the new restaurant

22     and what he is going to be paid, because one thing that we

23     could discuss is maybe garnish his wages to pay the settlement

24     going forward.  Because he's not doing this for free, he is the

25     operator.  What's he being paid by the new entity?  And he

1  should be able to answer that right now.

2          THE COURT:  I know Mr. Liga wants -- I know Mr. Drory

3  wants to speak with Mr. Liga and I will hear from Mr. Liga, but

4  I guess the issue is:  Does it make sense, sir, to table for

5  the moment the discussion about these additional legal fees

6  that have been incurred?  I know, sir -- and I'm not sure

7  Mr. Liga is aware of this, I know Mr. Schaffer believes that I

8  have it in my powers to assess as well a premium for the

9  collection of this debt, and I have thought about it but I

10 haven't decided the issue, and I keep hoping that I won't have

11 to decide it.

12         But Mr. Liga, do you want to -- I know Mr. Drory

13 wanted to speak to you, do you want to speak to him?  And then

14 do you two want to -- I could step in the back for a brief

15 period of time if the three of you want to talk and see whether

16 this is at all something that would be useful, for example, my

17 putting it over for 30 days while you have the very, very

18 detailed document intensive discussions, that's fine by me, but

19 I guess the question is, Mr. Schaffer, do you want to allow

20 Mr. Drory to speak with Mr. Liga and then speak with him

21 yourself?

22         MR. SCHAFFER:  I would rather let them speak right

23 now.

24         THE COURT:  Mr. Liga, do you think that you need more

25 than a few moments for this?

1          MR. LIGA:  No.

2          THE COURT:  Then I will stay here.

3          (Pause)

4          THE COURT:  Mr. Liga, will this take longer than

5     expected?

6          MR. LIGA:  It won't be long, but I have to have a

7     candid discussion with my client.

8          THE COURT:  Should I stay here?

9          MR. LIGA:  Yes, your Honor.

10          (Pause)

11          THE COURT:  Mr. Liga, thank you.

12          MR. LIGA:  Couple of things.  Some of the suspicion of

13     my client, I understand it to some extent, but I can tell you

14     someone who has been representing these types of clients for my

15     entire career, these kind of scenarios are not uncommon, people

16     closing one and finding investors to open up another one, it's

17     not uncommon at all.

18          According to my client, and again, I will cooperate in

19     every way I can, close to $2 million he's claiming is owed in

20     taxes from the old restaurant, 800,000 personally to him.

21          THE COURT:  I want to hear you say that again, please,

22     sir.  He is claiming to be owed?

23          MR. LIGA:  The old restaurant in sales tax and payroll

24     taxes and so forth, close to $2 million.

25          THE COURT:  Was paid?  I don't know what the words

1   mean.  Sir, is that money he paid and is seeking payment back

2   of, is that money that is owed and outstanding?

3           MR. LIGA:  Owed and outstanding.

4           THE COURT:  On the company.

5           MR. LIGA:  On the business.

6           THE COURT:  Not on him.

7           MR. LIGA:  However, when you have these kind of cases,

8   payroll taxes, for example, goes to the responsible party.

9           THE COURT:  Which is he.

10           MR. LIGA:  Which is he.  Anybody who could sign the

11   checkbook goes to the responsible party.

12           THE COURT:  What's the payroll tax figure, sir?

13           MR. LIGA:  I don't know the exact figure.  He told me

14   a combined figure just now, and I haven't seen it myself I'm

15   going by my client's representations.

16           THE COURT:  I understand.

17           MR. LIGA:  $2 million between sales taxes and payroll

18   taxes.  I knew about the sales tax from my interaction with him

19   six months ago, I didn't know about the payroll taxes.  And now

20   he's told me personally right now there's a lien against him

21   for 800,000 from the Internal Revenue Service.

22           THE COURT:  That's a personal tax owed?

23           MR. LIGA:  I think it's responsible party, partially

24   responsible party tax assessment.

25           And as far as the new place, he did not sign the

H31TORUC

1    lease, he is not on the liquor license, and he is not an owner.

2    He also represented to me that he's not taking a salary of any

3    kind on this new entity.

4         And I can tell you, your Honor, again, my firsthand

5    knowledge, that he has asked me on numerous occasions to

6    introduce him to people in the restaurant business and the food

7    industry to see if they wanted to invest money.  My opinion, I

8    don't know if that new restaurant will ever open given the size

9    of it and magnitude of it and how expensive it is.

10        THE COURT:  Has someone signed a lease, sir?

11        MR. LIGA:  As far as I understand, yes.

12        THE COURT:  Has someone put up money for the

13   construction that would necessarily have to take place to make

14   it work?

15        MR. LIGA:  I believe partially, yes.

16        THE COURT:  The construction has not concluded.

17        MR. LIGA:  No, as far as I understand, no.

18        THE COURT:  Is there a projected date for completion

19   of the construction?

20        MR. LIGA:  I have been hearing -- again, it's all

21   based on getting the money -- anywhere from four to five months

22   from now, provided they get the money.

23        THE COURT:  And that, sir, is just for construction,

24   it's not for opening the place, or is that for opening the

25   place?

1    MR. LIGA:  I think that's full-blown construction,

2    permits, equipment, the whole nine yards.  And it's also my

3    understanding part of the delay has been in getting certain

4    permits, and it is also my understanding -- it's been

5    represented to me that the rent on that space is 108,000 a

6    month, and there is no abatement of rent during the process of

7    building that restaurant.

8    THE COURT:  Mr. Drory is not on the hook in any way

9    for that rent.

10    MR. LIGA:  Not personally on the hook at all.  He's

11    not on the hook, he's not on the lease.

12    THE COURT:  He's not a responsible party under any

13    theory.

14    MR. LIGA:  As far as I know, no.

15    THE COURT:  So if some kind soul wants to foot the

16    bill for 108,000 a month in rent, they're doing it.

17    MR. LIGA:  You have to understand, your Honor, to give

18    you an idea of the type of culture, you take a restaurant like

19    the old one, there's regulars that come in all the time, very

20    wealthy people, older people, they love the restaurant, they

21    love the people, they have tons of money, they don't know what

22    to do with it, and they go to someone like him:  Oh, we would

23    like if you opened up another restaurant.  And the people come

24    and open their checkbook, here's a half a million, here's a

25    million.  These are the kinds of people.

1          Ultimately it gets to a point where you need a

2    professional finance company, hedge fund perhaps, to come in.

3    And that's where he falls down, because they don't go by the

4    websites and the pretty pictures, they want to see business

5    plans and financial models and corporate structure.  And that's

6    where he's been falling short.

7          And frankly, my interaction with him has been to try

8    to educate him of what he needs, and his girlfriend, who does

9    this for a living, she's also been doing it, but she's busy

10   doing her own job, she's not doing it for him.  He understands

11   that, but that's -- I think it's an extremely, extremely,

12   extremely risky venture because you committed to this space and

13   committed to a project, and as far as I know, they're nowhere

14   near having the money to complete it.

15         So again, I have no problem stepping in the shoes, as

16   I would have if I was his bankruptcy counsel, and going through

17   an examination of his documents, his finances.

18         THE COURT:  Sir, do you have clarity on the unsecured

19   debt to the girlfriend and its repayment?

20         MR. LIGA:  My understanding, as of right now, it's in

21   the ballpark of two and a half million dollars.

22         THE COURT:  It still exists?

23         MR. LIGA:  My understanding is yes.

24         THE COURT:  It has not been paid.

25         MR. LIGA:  No.

1           THE COURT:  If I may ask, is it for money she's loaned

2   to him in connection with these ventures, is it rent payment

3   she made on his behalf?

4           MR. LIGA:  For example, my understanding she's the one

5   who signed the lease, she's the one who put the money up for

6   the lease.

7           THE COURT:  She signed the lease for the new place?

8           MR. LIGA:  Yes.

9           THE COURT:  You didn't say that.  Now you did, of

10  course.  So every month she's getting dinged $108,000.

11          MR. LIGA:  Her and whatever other investors she brings

12  in.

13          THE COURT:  Was she an investor?

14          MR. LIGA:  Yes.

15          THE COURT:  So why does he owe her money for that?

16          MR. LIGA:  This has nothing to do for that.  This is

17  money she's putting into the other place.

18          THE COURT:  Interesting.

19          MR. LIGA:  She was -- my understanding -- again, I

20  haven't looked at the whole bankruptcy package, my

21  representation has been quite limited, but she's the biggest

22  creditor in that bankruptcy.

23          THE COURT:  Because she has been --

24          MR. LIGA:  She put money into the old restaurant.  So

25  my understanding is she's owed millions of dollars from money

1    she put in the old restaurant.

2            THE COURT:  It's your understanding as well, sir, that

3    Mr. Drory has not given her any money personally in payment of

4    those debts?

5            MR. LIGA:  My understanding is no.  I can't speak,

6    your Honor, I'm not -- I'm not Mr. Drory, I don't sit in his

7    house, I don't know what he does with his girlfriend, I don't

8    know if he gave her a case of cognac out of the bar, I don't

9    know any of those things.  But as far as I know, there's been

10   no payments made that I am aware of.  But again, to put this to

11   bed the only way I know how is to allow plaintiff's counsel to

12   sit down with me, and if he doesn't know the right questions,

13   frankly I will give him the right questions to ask about the

14   right things to go through.

15           THE COURT:  I get the sense he knows the right to

16   questions.

17           Mr. Schaffer, do you want to do this?

18           MR. SCHAFFER:  Could I just address a couple of things

19   Mr. Liga just said?

20           THE COURT:  Sure, but at some point you guys have to

21   come to a decision and not just tell me what you agree and

22   disagree with.

23           MR. SCHAFFER:  Your Honor, for one thing, just so your

24   Honor understands the picture here, it's not like the lease was

25   up for the restaurant on Park Avenue, the initial -- the old

1    Artisanal, and that lease was up and they signed a new lease

2    for this new space.  This new restaurant was in the works for

3    about two years before Artisanal was closing.  So it was all in

4    the works.  It's not like number one failed and then let's do

5    this number two.

6            So to say that Mr. Drory was not involved with the new

7    location is preposterous.  He had this restaurant, it was doing

8    well, the lease was up in two years.  In advance of that they

9    said let's look for the new space.  Again, I can represent to

10   the Court it took my law firm two years to find new office

11   space.  It takes a long time.  He looked and he got the new

12   commercial space.  So this thing has been in the works for

13   about two years.

14           To say that -- I can't believe that it was just

15   represented to the Court that Mr. Drory is not to receive one

16   single penny for work that he performs or has performed.

17           THE COURT:  I should have asked that question of

18   Mr. Liga.

19           Mr. Liga, if he's not getting a salary, is he getting

20   something on the back end, a percentage of profits?  It would

21   be interesting but unwise for him to do it for no remuneration

22   whatsoever.

23           MR. BONFITTODRORY:  Excuse me, could I speak with my

24   counsel, please.

25           MR. LIGA:  I will say, as far as I understand, I never

1    represented to this Court that Mr. Drory wasn't behind the

2    concept of the new restaurant.

3            THE COURT:  No, I understand that, but I thought you

4    said he wasn't getting a salary.

5            MR. LIGA:  My understanding he has not gotten a

6    salary.

7            THE COURT:  Will he not then be the operator?

8            MR. LIGA:  If and when it opens.

9            THE COURT:  Will he then get a salary?

10           MR. LIGA:  I imagine so, yes.

11           THE COURT:  That's the clarification I need.

12           Sir, would it be easier if you sat next to your

13   client, just because he seems to want to mention things to you,

14   and it might be easier to have you sitting near him.

15           I will let you do that, and Mr. Schaffer, finish your

16   thoughts.

17           MR. SCHAFFER:  My last point, your Honor, is I will

18   certainly go down this rabbit hole --

19           THE COURT:  That's as you see it.  I don't want to

20   immediately impugn it by saying it has no chance of being

21   valuable.

22           MR. SCHAFFER:  I will attempt to see what the

23   documents will show.  But what I'm going to be asking for, and

24   I can propound a letter to counsel in a week or so, but I'm

25   going to want everything.  I'm going to want to see like the

1  last two or three years of his personal bank accounts, I'm

2  going to want to see all the agreements for the new restaurant,

3  I want to know what he was paid and what he will be paid for at

4  the new restaurant.  It will be a complete disclosure.

5          And frankly, since counsel offered this, what I would

6  like to do is after the disclosure is made I would like

7  Mr. Drory to sit for a deposition, and I would like to take his

8  deposition under oath, as counsel had volunteered.

9          THE COURT:  Okay.

10          MR. LIGA:  I have nothing else to add, your Honor,

11  other than Mr. Drory wanted to explain to me when he purchased

12  the old restaurant it was purchased with $1.7 million of debt

13  at the time.  And it was Ms. Shulman, his girlfriend, who

14  helped him at that time purchase the restaurant.

15          And part of his deal, apparently -- and I have not

16  seen paperwork -- was that she wanted to own the name and the

17  concept of a Parisian cheese fromagerie restaurant bar.  And I

18  can tell you from my own conversations with Stephanie Shulman,

19  her interest is more developing the concept and maybe

20  franchising it down the road or something.

21          This other restaurant was viewed as an expansion of

22  that idea, but again, while it was certainly his vision and she

23  financed the vision, he planned this other restaurant with her

24  believing, I'm sure, because it wouldn't make sense otherwise,

25  that the old restaurant would survive, that it would -- why

1    would you buy it if you didn't think it was going to survive?

2           And I can tell you from my own conversations, again

3    from my background, it's very frustrating for me when I deal

4    with clients like Mr. Drory because sometimes their optimism is

5    too much.  And I live more where the rubber meets the road.

6    I'm a numbers guy.  That is what makes him attractive to

7    investors because he has these big ideas.  Someone like me is a

8    boring guy, and someone like him is an interesting guy.  And

9    that's why investors go with the interesting guy.  They ask the

10   boring questions but go with the interesting people.

11          But I would be more than happy to answer and address

12   any document request or go through any due diligence that

13   plaintiff's counsel would want to go through.

14          THE COURT:  And that included, sir, your offer of a

15   deposition, and it seems Mr. Schaffer has taken you up on it.

16          What I would like to do is the following:  I want to

17   have the parties have those discussions.  It is my

18   understanding, Mr. Liga, that Mr. Schaffer is going to be

19   giving to you in the next week the written requests, and I

20   imagine they will be substantial.

21          It would still be my expectation that within that

22   30-day period you could have the discussions that you need to

23   have on these financial issues and you could perhaps get the

24   deposition in as well.  And I will listen to you if 30 days

25   comes and you have it scheduled but haven't had it yet.

1    But I would like a letter from Mr. Schaffer, a brief

2 letter, letting me know where the parties stand on the 3rd of

3 April, that is a Monday, and tell me what is going on, and

4 we'll plan accordingly.  I'm not going to do anything today.

5 Everything is open today.  But I think it makes sense, since we

6 have differing perspectives and differing information about

7 Mr. Drory's situation, there should be an opportunity to have

8 that laid out.

9    Mr. Schaffer, is there anything else we should be

10 discussing today?

11    MR. SCHAFFER:  I would just propose, as a potential

12 timeline, that I send my letter by March 8.  Presumably counsel

13 should be meeting with Mr. Drory as of today and start

14 gathering relevant documents.  It's not going to be a surprise

15 to what I will be asking for.  And he should be able to give me

16 a response and provide the documents by March 22nd, two weeks

17 after that.  Then I would just put a control date, if we could,

18 that that deposition will take place by April 15th.

19    THE COURT:  Mr. Liga, will that work for your

20 schedule?  I don't know what you're doing other than this case.

21 So if you were to receive the document requests on the 8th of

22 March, it would be my expectation as well that within two

23 weeks, by the 22nd of March, you could produce those materials

24 and have Mr. Drory deposed on or about the 15th of April.

25    Does that work for you?

1            MR. LIGA:  I could probably arrange for that.

2            THE COURT:  Let me change my schedule.  Let me hear

3       from the parties -- the 15th of April is a Saturday, so perhaps

4       the 14th of April.  Let me hear from the parties by the 21st of

5       April, just a letter -- actually I don't care who sends it to

6       me as long as you're both in agreement with its contents, and I

7       will plan from there.  If there are any problems in the

8       discovery from either side, just write me and let me know.

9            Mr. Schaffer, anything else?

10           MR. SCHAFFER:  No, your Honor.

11           THE COURT:  Mr. Liga, anything else?

12           MR. LIGA:  No.

13           THE COURT:  Thank you all very much for coming down

14      this morning.

15                              o0o

16

17

18

19

20

21

22

23

24

25